## PERSONAL LIABILITY OF BANK DIRECTORS FOR LOSSES DUE TO MISMANAGEMENT AND ACTION THEREON.

Common Pleas Court of Franklin County.

H. A. GLASS ET AL v. W. S. COURTRIGHT ET AL.

Decided, March, 1913.

*Banks and Banking—Stockholders of a National Bank May Bring an Action Against Directors for Losses On Account of Mismanagement —Demand on Receiver Not Necessary—Forfeiture of Franchise Not a Prerequisite Where Recovery is Sought for Knowingly Violating the Banking Statute—Liability of Directors May Be Determined by State Court—When Receiver's Right to Collect on Statutory Liability Can Be Exercised Only for Purpose of Paying Debts—Stockholders Proper Parties, When—Adjustment of Variant Liability of Directors—Dividends Illegally Paid Will Be Deducted from Losses— Character of Action Against Directors—When Right of Action of Stockholders Accrues—Directors Required to Exercise Ordinary Care Only—Not Liable for Misfeasance of Former Directors—Pleading—Application of Statute of Limitations—Actions in Equity and at Law—Sections 11224, 11227 and 11238.*

1. Stockholders of an insolvent national bank which is in the hands of a receiver, appointed by the comptroller of the currency to wind up its affairs and pay its debts, may bring an action in their own names against the directors of the bank personally for losses due to mismanagement of the bank, without having first made a demand upon the receiver.

2. Forfeiture of the franchise of a national bank is not a prerequisite to enforcement of the personal liability of directors prescribed by Section 5239, United States Revised Statutes, for knowingly violating the banking statutes, and an action against the directors for damages resulting from known violations of the federal banking act may be brought by stockholders in their own names.

3. State courts in stockholders' suits may determine the liability of directors of a national bank both at common law and under the national banking act, the statutory duty, however, being determinable under the statute in so far as the particular acts fall within its provisions.

4. Neither Section 5239, United States Revised Statutes, nor Section 5234 authorizes a receiver to collect damages for the statutory liability created for the benefit of stockholders of a national bank, the

receiver's rights are to be exercised only when necessary to pay debts of the bank.

5. A receiver of a national bank represents the office of comptroller of currency who appoints him, and in an action against its directors for mismanagement, allegations respecting the participation of the comptroller in the acts of the bank, being of such nature as to press themselves upon the consideration of a court of equity charged with the duty of conserving the rights of stockholders, set forth reasons for recognizing the stockholders as parties, rather than the receiver, to bring the action.

6. An action for misfeasance in the management of a national bank, brought by stockholders against its directors, some of whom were directors when the wrongful acts were committed and some of whom were elected subsequently thereto, requires adjustment of variant liability, and renders the cause one in equity in which the court may apportion liability according to the loss of capital resulting from their acts.

7. Illegal dividends paid by directors of a national bank to its stockholders will be deducted from their losses upon determination by a court of equity of the losses sustained by stockholders growing out of mismanagement by such directors, and may be adjudicated in the principal action.

8. An action against directors personally for mismanagement of the affairs of a national bank, charging them with purchasing worthless or doubtful notes and bills from another bank taken by it for money loaned, accepting a promissory note executed by the latter bank, assuming its debts which were greater than its assets and making the former bank insolvent at its inception, is based on the common law obligations of such directors. The fact that other and subsequent transactions by such directors directly or indirectly impaired the financial condition of the bank does change the nature or character of the action; nor does the fact that some of the directors were subsequently elected, causing a variant liability, effect an increase of causes of action, but are mere links to constitute the cause one in equity.

9. Allegations in an action under Section 5239, United States Revised Statutes, by stockholders against the directors of a national bank that certain directors mismanaged the affairs of the bank and certain other directors, elected after the acts of mismanagement were committed, knew or would have known if they had discharged their duty, of the wrongful acts complained of, neither allege knowledge or negligence, express violation of the statute, or the common law obligation of the directors.

10. An action by stockholders of a national bank in their representative capacity against its directors personally, for mismanagement of the

affairs of the bank, involving an accounting, is an exclusively equitable proceeding and is governed by the ten years' statute of limitations, prescribed by General Code, 11227, and not the four years' limitation, prescribed by General Code, 11224.

11. An action by stockholders against directors for loss of stock by mismanagement is distinguished from an action by a receiver for loss of corporate assets, and does not accrue as of the date of the mismanagement but from the date the loss actually occurs.

12. Notwithstanding General Code, 11238, providing that there shall be but one form of action, the distinction between suits in equity and actions at law has not been abrogated. Observance of this distinction is essential to a proper application of the rule of limitation to the particular cause of action.

13. Directors of a national bank, elected after consolidation with another bank and following its organization as such are not, under the rule of ordinary care required of them, liable personally for the mismanagement or misfeasance of former directors by which the stock of the bank was rendered valueless, especially if the new directors constituted a minority of the board and relied on the reports of the bank examiners and comptroller of the currency, notwithstanding an investigation of prior management of the bank would have disclosed the insolvency of the bank.

14. Allegations, in an action for misfeasance of directors of a national bank, to the effect that directors elected after such misfeasance circulated abstracts from government reports of the bank's solvency, by reason of which the bank was kept open for twenty-one months longer, do not state a cause for diminution of assets which renders the new directors personally liable, and particularly is this true where there are sufficient assets to pay the debts of the bank.

*M. R. Patterson* and *D. K. Watson*, for plaintiffs.

*Vorys, Sater, Seymour & Pease, A. H. Johnson, Wilson & Rector, Harry West, J. M. Hengst, E. C. Morton, Booth, Keating, Peters & Pomerene, C. S. Cherrington, Gumble & Gumble* and *J. M. Butler*, contra.

KINKEAD, J.

This case is again before the court on motions made by defendants Orr, Smith and others to the amended petition, and a demurrer by defendant, J. W. Meek.

The demurrer questions the legal capacity of the plaintiffs to sue; claims that there is a misjoinder of parties, plaintiffs and

defendants; misjoinder of several causes; separate causes against several defendants improperly joined; that the action is barred by the statute of limitations, and that the petition does not state facts sufficient to constitute a cause of action.

The first question to be considered is whether plaintiffs have the right to bring this action.

THE PETITION.

The plaintiffs are stockholders in the Union National Bank and in that capacity bring the action against directors of the bank for mismanagement of the affairs of the bank. The petition alleges that:

"Plaintiffs bring this suit in behalf of themselves and all other stockholders of the Union National Bank, which said stockholders are numerous and residing in various counties of the state of Ohio and in other states."

From the petition it appears that the comptroller of the currency of the United States took possession of the bank and appointed one R. W. Goodhart receiver, who is now engaged in liquidating and winding up the affairs of the bank, "but plaintiffs aver that said receiver is not a suitable person and is disqualified to bring and maintain this suit because the comptroller of the currency aided and abetted in the acts of misfeasance herein complained of."

The acts which go to this alleged disqualification are that the Union National Bank, when it started into business, bought and took over from the Merchants & Manufacturers National Bank (its predecessor) notes and bills to the amount and face value of $2,461,208.56, which were owned by the latter bank and were given to it in the course of its business for money loaned, except one note for $73,997.59 which was executed direct by the Merchants & Manufacturers National Bank to the Union National Bank. The consideration for the purchase of these securities by the Union National was the undertaking by the latter to pay the debts and deposit accounts of the Merchants & Manufacturers National Bank, amounting to $3,576,120.44. It is

charged that the Union National, from the purchase as above until it was closed, paid and continued to pay such debts and deposits from its capital and other assets, and that the assets now in the hands of the receiver are sufficient to pay the debts of the Union National including the debts assumed by it of the Merchants & Manufacturers Bank.

It is charged that a large amount of such notes so taken over from the Merchants & Manufacturers Bank, and which were carried as assets, were of little or no value, and are mentioned and described in the petition and amount in all to many thousands of dollars.

It is averred that the Union National Bank was at the time it commenced business and up to March 30, 1910, totally insolvent by reason of the worthless assets so taken over from the Merchants & Manufacturers National Bank.

It is then averred that about February, 1910, the business of the Union National Bank became injuriously affected by a suit in this court against certain stockholders of the Merchants & Manufacturers National Bank, which involved the management of that bank; that directors of the Union National Bank became apprehensive that they would not be able to continue the business of the Union National Bank without improving its financial condition and called to their assistance the comptroller of the currency, who sent a representative to assist defendants in that behalf, and who continued to render such service until after March 30, 1910. The losses to the Union National Bank at that period, it is averred, arising from the worthless paper and assets taken over from the Merchants & Manufacturers National Bank were more than $1,000,000, which was known to the defendant directors.

On March 30, 1910, there was charged off the books of the Union National Bank on account of the foregoing worthless notes the sum of $921,022.04. To restore that loss certain promissory notes were procured to be made by the persons named in the petition, a part of which were given to the receiver of the Merchants & Manufacturers National Bank appointed by the comptroller to enable said defendant directors, it is alleged, to

settle the actions pending against them in the federal and state courts, a part of said defendant directors, Schaedinger, Courtright, Hubbard, Livesay and Peters, confessing judgment against them for $240,000, their notes being taken by the receiver of the Merchants & Manufacturers National Bank, who receipted the judgment in full. The Union National Bank by virtue of a certain contract alleged in the petition claimed the proceeds of the judgment, in pursuance of which the notes of Livesay and Peters were transferred by the receiver of the Merchants & Manufacturers National Bank to the Union National Bank.

It is averred that some of the defendant directors, named in the petition, to release themselves from liability for the losses to the bank, permitted certain transfers of notes, passing a resolution by the directory releasing certain of the directors from liability to the Union National Bank.

It is averred that certain pages of the general journal of the bank containing some of these transactions respecting the notes above mentioned, and the charging off of certain assets amounting to $921,022.04, and whereon the said notes of said defendant directors so given to release themselves from liability to the bank for their negligent losses thereto were entered, and whereon other substituted assets were entered, have been abstracted, concealed, destroyed or lost, which was done to conceal the true financial condition of the bank.

It is charged in the petition that the comptroller of currency advised the abstraction of the pages by and through his representative, and in furtherance of a design to prevent the stockholders from knowing what had been done; that the comptroller wrote a letter addressed to the board of directors of the Union National Bank, April 1, 1910, which was spread upon the minutes of the board April 7, 1910, such letter stating that the capital of the bank of $750,000 and its surplus of $100,000 were unimpaired.

It is averred that on March 30, 1910, the bank building which cost $300,000, and which had been carried on the books for that sum, was increased on the books in the sum of $150,000 with the

consent of the comptroller, which amount was put into the bond, stock and securities account, and which was to cover up the losses, was false and fictitious.

It is charged that the directors made loans to the Beggs Company in January, February and March, 1908, to an amount in excess of its capital stock, contrary to the National Bank act; that false and untrue reports were made during 1910 and 1911, and that false dividends were also declared.

### RIGHT OF PLAINTIFFS TO MAINTAIN ACTION.

Considering the special demurrer questioning the right of plaintiffs as stockholders to bring this action, the general doctrine that for acts of gross neglect, fraud or violations of specific duties required by provision of the national banking act, on account of which the directors have wasted the assets or capital of a banking corporation, an action to recoup such losses from the directors is to be brought by the corporation itself. If it is in the hands of a receiver, then the latter must bring the action. The principle is that the corporation is the legal entity representing all interests, the duty being incumbent upon its officers to act in all matters of interest to creditors and stockholders. A receiver who is appointed by a court of common law and equity jurisdiction takes the place of and acts for the corporation and all interested in its affairs.

A question arises whether, under the provisions of the national bank act, and the facts and circumstances of this case, a receiver appointed by the comptroller of the currency to wind up the affairs of the bank and pay its debts occupies the same position as one appointed by a court.

To determine the question whether plaintiffs as stockholders have the right to maintain this action without first having made demand upon the receiver, under the allegations of the petition, it is essential to consider the powers and duties of bank receivers under federal law as well as the remedial right for redress of the two classes of acts alleged in the petition.

The function and duty of a receiver under Section 5234, United States Revised Statutes, is to collect all debts, dues and

claims, sell or compound bad debts, sell real and personal property; and "if necessary, to pay the debts of such association, enforce the individual liability of the stockholders."

Under Section 1 of act June 30, 1876, a receiver appointed by the comptroller "shall proceed to close up such association, and enforce the personal liability of the shareholders as provided in Section 5234."

An individual or personal liability is imposed upon directors of a national banking association who "knowingly violate, or knowingly permit any of its officers, agents or servants of the association to violate any provisions of this title * * * (and) in cases of such violation, every director who participated in or assented to the same shall be liable in his personal and individual capacity for all damages which the association, its shareholders, or any other person shall have sustained in consequence of such violation."

But nowhere is any statutory duty specifically imposed upon the receiver in respect of such statutory liability or duty.

Receivers of national banks are federal statutory officers for certain prescribed purposes with limited powers and duties, whose powers are in nowise comparable with those which may be conferred by common law and equity courts upon receivers appointed by them.

National banks are creatures of the national government which has prescribed an arbitrary and peremptory method of closing and winding up its affairs through officers called receivers. A receiver of a national bank appointed by the comptroller is only authorized to proceed by action to sell or compound bad or doubtful debts, or to sell real or personal property, for the purpose of paying debts. But to do other acts in the course of his duty, he must have the incidental power to proceed by action in courts; for instance to enforce the shareholders' liability when necessary to pay debts, and to bring other legal actions.

And the receiver would, no doubt, have the right to proceed by action to enforce the personal liability of directors, if such liability is necessary to the payment of debts of the bank.

My study of the federal statutes and their policy leads me to believe that the design thereof is to primarily protect credi-

tors, and if the assets in the hands of the receiver prove sufficient to liquidate the debts, the receiver would not in the very nature of things be continued to carry on lawsuits to enforce common law liabilities which are within the exclusive province of courts, unless such power is taken away by legislation and vested somewhere else. Such is not the case here, but on the contrary, as we have shown, the powers of receivers so far as the federal statutes go, are limited.

A receiver appointed by a court may not bring an action to enforce a common law liability of directors without express authority; hence, *a fortiori* it seems reasonable to conclude that a statutory receiver can have no power except that expressly prescribed or which is incidentally necessary to carry out other powers expressly conferred. If we are right in the view that the receiver is authorized to wind up the bank to the end that the debts are paid, then he may not bring such an action as this, unless it be necessary to recoup the losses of the assets by the misfeasance of directors in order to pay debts.

The rule requiring a suit like this to be brought in the name of the corporation may not exactly be considered a mere technicality, because the theory is that whatever is recovered must pass through the corporate channel for the benefit of all creditors and stockholders. But it does seem that in a case like this, where a national bank is in the hands of a federal receiver who is winding it up, and where it is averred that there are sufficient assets in the hands of the receiver to pay the debts, and because of the provisions of the federal law as pointed out, substantial justice can be more readily done by a court of equity by permitting shareholders to bring such an action as this in their own name, under the circumstances appearing in this case.

Vice Chancellor Wigram in *Foss* v. *Harbottle,* 2 Hare, 461, although laying down the general rule in terms so emphatic as to have become classic, nevertheless very clearly indicated an exception in these words:

"If a case should arise of injury to a corporation by some of its members, for which no adequate remedy remained, except that of a suit by individual corporations in their private characters, and asking in such character the protection of those rights

to which in their corporate character they were entitled, I can not but think that the claims of justice would be superior to any difficulties arising out of technical rules respecting the mode in which corporations are required to sue.'' ,

So, I am of the opinion here that a stockholder may sue in his own name where the claims of justice demand and where no other adequate remedy exists for the wrong which the corporation has suffered. This is a principle that may well be applied under circumstances where the claims of justice demand, and no other remedy exists for the wrong which the corporation has suffered.

A number of federal court decisions are cited by counsel for defendants to the effect that a stockholder of an insolvent bank for which a receiver has been appointed (by the comptroller) can not sue the directors for loss of funds on account of mismanagement or neglect of directors to enforce the personal liability arising from violation of either common law or statutory law. But examination of these cases disclose that the holdings are based upon the ground that such action is either by an individual stockholder for the enforcement of a duty due and owing to the corporation for the benefit equally of all the creditors and stockholders, when the injury is done to the whole body of stockholders for which an individual stockholder may not sue on his own account, or when the action is primarily for the benefit of creditors and secondarily for the benefit of stockholders, or for both combined, in which case the rights of creditors draw the case within the province of the corporation or its receiver.

*Allen* v. *Luke*, 141 Fed. Rep., 695 (in behalf of both creditors and stockholders).

*Bailey* v. *Mosher*, 63 Fed Rep., 488 (the recovery was sought by a creditor).

*National Exch. Bank* v. *Peters*, 44 Fed. Rep., 13 (was by creditors).

*Boyd* v. *Schneider*, 131 Fed. Rep., 223, was a suit by depositors of an insolvent bank. The court met the claim that the recovery would be an asset of the bank vested by law in the re-

ceiver, and not one which creditors can bring, by the reasoning
that:

"It seems clear  *  *  *  that  *  *  *  the directors are
answerable in some kind of an action directly to the persons to
whom the duty ran; and that, to the extent the depositors suf-
fered losses therefrom, the right of action, whatever it may be,
runs directly to the depositors as a class.  The question is not
determined by whether the amount thus recovered might not be-
come an asset of the bank, but whether, aside from that, the
depositors may not enforce the liability as a right special to
them, a right growing out of the contract of deposit, and not
common, therefore, to stockholders," etc.

The right thus to sue, without the intervention of the re-
ceiver, seems to be sustained, indirectly at least, in *Briggs* v.
*Spaulding*, 141 U. S., 132.

But in none of them is the question squarely presented and
decided, with the exception of the decision by Judge Sage in
*Howe* v. *Barney*, 45 Fed. Rep., 668, which we can not follow,
that stockholders may not maintain an action for the benefit
of all stockholders for injury done to all of them as a body,
where it appears that the assets in the hands of the receiver
are adequate to liquidate all the debts of the corporation, and
nothing remains to be done but to determine the right of re-
covery for the benefit of all the stockholders for losses of their
stock.

### SUIT FOR KNOWINGLY VIOLATING PROVISIONS OF
### THE BANKING ACT.

The question is raised by the demurrer, under some of the
allegations in the petition, that the right to sue for the damages
resulting from acts of known violations by directors of any of
the provisions of the banking act does not exist in the plaintiff
stockholders in this form of action

It is contended that Section 5239, United States Revised
Statutes, prescribed an exclusive remedy for such acts, which,
in cases where a national bank is in the hands of a federal re-
ceiver, must be brought by such receiver.  Section 5239 is as
follows:

Section 156. "If the directors of any national banking association shall knowingly violate, or knowingly permit any of the officers, agents, or servants of the association to violate any of the provisions of this title, all the rights, privileges, and franchises of the association shall thereby be forfeited. Such violation shall, however, be determined and adjudged by a proper circuit, district or territorial court of the United States, in a suit brought for that purpose by the comptroller of the currency, in his own name, before the association shall be declared dissolved."

Section 157. "And in cases of such violation every director who participated in or assented to the same shall be held liable in his personal and individual capacity for all damages which the association, its shareholders, or any other person shall have sustained in consequence of such violation."

It is held in *National Exch. Bank* v. *Peters, supra,* that this section prescribes an exclusive method of enforcing the liability of directors for violation of the banking act

*Zinn* v. *Baxter,* 65 Ohio St., 341, is urged as a conclusive authority to the same effect. The precise question decided in that case was that one who has been a shareholder in a national bank, but who has parted with his stock, can not maintain an action for damages resulting to him individually and for his own benefit alone, while the bank is a going concern, and has not been dissolved by proper action by the comptroller of the currency in a federal court.

It was not decided whether stockholders may bring such action after such dissolution, although the rule is laid down in the first proposition of the syllabus to the effect that:

"Where the directors of a national bank have violated the provisions of the National Banking act, to the damage of the bank and its shareholders, and the bank fails, upon request to bring an action against such directors for the recovery of such damages, an action may be maintained for that purpose by a shareholder; but such action must be brought by such shareholder on behalf of himself and all other shareholders, the bank must be made a party, the judgment must be in its favor, and the proceeds of such judgment will inure to the common benefit of all the shareholders alike. Such action may be brought in a state court."

The above quoted syllabus was only the reasoning leading to the point actually decided. But it is a distinct recognition of the right of stockholders, when the bank fails, to bring an action for damages resulting from specific violations of the national bank act in the state court.

And by counsel for defendants it is claimed to be conclusive of the duty required of stockholders to make demand upon the receiver to bring this action.

*Zinn* v. *Baxter, supra,* so far as concerns the point decided is not an authority, but its reasoning is helpful, and supports the view which we have taken of Section 5239, United States Revised Statutes. This section authorizes the comptroller to bring action in the federal court to forfeit the franchise of a bank for acts of directors knowingly violating any provisions of the banking act. This the comptroller did not do in the case of this bank. On the contrary, he appointed a receiver to close up the affairs of the association for one of the reasons, or upon one of the grounds, specified by Section 452 of the national bank act, no doubt for failure of such bank to make good impairment of its capital. Section 5205, United States Revised Statutes.

That part of Section 5239 prescribing a personal liability on the part of directors for knowingly violating provisions of the banking act is a matter entirely separate and distinct from the remedy prescribed for forfeiting the franchise. It is in fact the creation of a statutory liability, the statute being entirely silent on the question when and where the action for its enforcement may be maintained. But, clearly, shareholders are given the right to recover under the statute, and this right was recognized in *Zinn* v. *Baxter, supra.*

Who may enforce this liability, will depend upon the fact whether its enforcement is essential to make good the loss of assets to pay debts, or to make good the loss to the stockholders.

If the enforcement of the obligation is not necessary to the payment of creditors, it is then within the power of common law courts to enforce the liability in a proper action for the benefit of the whole body of stockholders, if their rights as such have been destroyed by such violation.

### INSOLVENCY OF BANK—ASSETS SUFFICIENT TO PAY DEBTS.

The allegations in the petition are that the bank was insolvent from the time it took over the assets of the old bank, and that it practically remained so throughout.

Insolvency of the bank means that it can not alone pay its debts, but it can not pay its stockholders, which is a liability. If the receiver has enough assets with which to pay debts, and nothing more, then, it is demonstrated that the corporation is at an end, and that the stockholders are the persons who sustain the loss.

### FORFEITURE OF FRANCHISE OF BANK NOTHING TO DO WITH THE CASE.

The arguments presented that there must first be a forfeiture of the franchise as a prerequisite to the enforcement of the liability under Section 5239 are discussed in *Wells* v. *Graves,* 41 Fed. Rep., 459, is not well taken, because Section 5234 authorizes the receiver to enforce the individual liability of stockholders to pay debts, which is a double liability and has no relation whatever to the personal liability of directors. Besides, it is later held not a necessary condition precedent that violations of the banking act should have been previously adjudged in a suit brought by the comptroller. *Allen* v. *Luke, supra.*

The closing out of the business of a bank by a receiver is an effectual end of the bank, and it may not continue to exercise its franchise without rehabilitation of its assets in some way with the approval of the comptroller.

So there seems to be no merit whatever in the claim that an action like this can not even be brought by the receiver until the franchise is forfeited.

The corporation is as well as dissolved for all practical purposes. In as much as its affairs are all in the hands of the federal receiver for the payment of its debts, and there is enough assets in the receiver's hands to pay the same, nothing remains for the corporate entity to do by itself, nor the receiver, after the debts are paid.

. That being so there is nothing remaining but the determination of the rights and liabilities arising from the allegations in the petition between stockholders and directors.

## MAY RECOVERY BE HAD FOR VIOLATION OF COMMON LAW DUTY AND STATUTORY DUTY UNDER NATIONAL BANKING ACT BY STOCKHOLDER'S SUIT?

Without calling specific attention to the grounds of complaint it is clear that they charge both common law liability as well as violation of statutory duty both by neglect and knowingly.

There is no exclusive remedy for violation of the national bank act either neglecting, or knowingly under Section 5239. As already stated the federal statute prescribes the exclusive test or measure of duty when claim is made under them.

The determination of both classes of liability are within the power of this court, the statutory liability being determinable under the statute in so far as the particular acts fall within the statute.

,Whatever the liability may be the powers prescribed by Section 5234 upon the receiver are to be exercised only when necessary to pay debts.

Burkett, J., in *Zinn* v. *Baxter, supra,* on page 367, stated:

"The correct rule is, that as congress has legislated upon the subject, and given and defined the right of action, the right then given by congress is the only right, and that the action must be maintained under the act of congress or fail; and that the liability of the directors of a national bank is measured by that act alone, and can not be enlarged or changed by the common law or rules of equity."

The judge then refers to *Briggs* v. *Spaulding, supra,* which was a bill by a receiver of a national bank against the directors for damages, the charges being independently of the acts of congress that they were liable as trustees for the bank, its stockholders and creditors, stating that the court disposed of the case in favor of the directors upon the provisions of the national banking act alone. Burkett, J., further adds:

"The duty of directors being declared by that act, as well as their liability for the violation of that duty, it is competent to resort to the common law and rules of equity to ascertain whether such duty has been properly performed.  *  *  *  It is therefore clear that the common law and rules of equity can not be invoked in opposition to the acts of congress to enable a shareholder in an action  *  *  *  to maintain such action against the directors, after he has parted with his stock."

Section 5239 imposes a personal and individual liability for damages upon directors who knowingly violate or knowingly permit officers to violate provisions of the banking act.

There is a wide distinction between knowingly violating some one or more of the national bank statutes, and acts which are purely negligent. While this statute prescribes "The statutory standard of liability" for express violations of national bank statutory provisions, as stated in *Mason* v. *Moore*, 73 Ohio St., 275, 290, it does not as stated in the same opinion (p. 291) "preclude a liability at common law."

The distinction between the statutory and common law liability is clearly drawn in the case of *Yates* v. *Bank*, 206 U. S., 158, in the following language:

"Mark the contrast between the general common law duty to diligently and honestly administer the affairs of the association" (the language of Section 5147 prescribing oath of directors) "and the distinct emphasis embodied in the promise not to knowingly violate, or willingly permit to be violated, any provisions of this title. In other words, as the statute does not relieve the directors from the common law duty to be honest and diligent, the oath enacted responds to such requirements. But as, on the other hand, the statute imposes certain express duties and makes a knowing violation of such commands the test of civil liability, the oath in this regard also conforms to the requirements of the statute by the promise not to knowingly violate, or willingly permit to be violated, any of the provisions of this title."

"In other words," the court says, "as the statute does not relieve the directors from the common law duty to be honest and diligent, the oath exactly responds to such requirements."

The rule established by the Supreme Court of the United States is that:

"Where a statute creates a duty and prescribes a penalty for its non-performance the rule prescribed by the statute is the exclusive test of liability.

"The National Banking act (Rev. Stat., 5239) affords the exclusive rule by which to measure the right to recover damages from directors, based upon a loss resulting solely from their violation of duty expressly imposed upon them by a provision of the act.   *   *   *

"Where by a statute a responsibility is made to arise from its violation knowingly, proof of something more than negligence is required; and that the violation was in effect intentional." *Yates* v. *Bank,* and *Allen* v. *Luke, supra.*

Here the distinction between the negligent performance of acts and an intentional act knowingly violating some provision of the act is clearly drawn. .

These distinctions have some bearing on the question raised by the demurrer whether the plaintiff stockholders may maintain this action, or whether they should have first demanded that the receiver bring the same.

The allegations concerning the violations of the provisions of the banking act do not however clearly and definitely charge the same to have been knowingly committed, being in the alternative, as having been either knowingly done, or due to neglect.

There is nowhere either in Section 5239 or elsewhere any provision authorizing a receiver to collect the damages for the statutory liability created for the benefit of stockholders where the rights of creditors are not involved.

And it is within the right of the plaintiffs to claim recovery for such acts in the state courts.

### ALLEGATIONS AGAINST THE COMPTROLLER.

While the receiver is a person acting under authority of federal law, and having the powers thus conferred, he is in a measure representing the office of comptroller of the treasury. The allegations made in respect to the participation of the comptroller in the various acts of the bank are of such a nature and character as to press themselves upon the consideration of a court of equity charged by law with the duty of conserving the rights of

stockholders under the common and statutory law, and may appropriately be considered as an additional reason why the court should recognize the right of the stockholders to maintain the action in its present form.

· For the reasons stated the ground of demurrer that plaintiffs have not the right to maintain this action is overruled.

IS A CAUSE OF ACTION STATED? WHAT IS ITS NATURE AND CHARACTER? IS IT A SINGLE CAUSE OR MORE THAN ONE?

The directors of a banking corporation at common law are personally liable if they suffer corporate funds or property to be wasted or lost by gross negligence or inattention. They are also personally liable for all damages accruing under 5239 Revised Statutes, to · stockholders, resulting from the directors themselves knowingly violating any provisions of the banking law, or for permitting any of its officers to violate the same. To permit is to have knowledge. The first act charged is in purchasing $2,461,208.56 of notes and bills from the M. & M. National Bank, which were taken by the latter bank for money by it loaned, except one note for $73,997.59 which was executed by the vendor bank to the Union National Bank, and it is incidentally alleged that the Union Bank took over their property and assets. In this purchase and sale, the Union Bank agreed to pay the debts of the M. & M. Bank amounting to $3,576,120.44.

These assets were entered on the books of the Union to the present time. It is alleged that the bank was in fact insolvent at the time it commenced business.

A. Brenholts, F. W. Hubbard, E. K. Stewart, George J. Schoedinger, D. C. Beggs, J. W. Meek, C. K. Davis and E. A. Cole were each and all directors when the bank was organized, each continuing as such for variant times, Brenholts till April 7, 1910, Hubbard to January 10, 1911, Stewart to May 18, 1911, Schoedinger to June 16, 1910, Beggs to July 23, 1908, Meek to March 30, 1911, Davis to December 30, 1909, Cole to January 8, 1907.

We have here then for consideration what counsel have characterized the "original crime of 1905."

If the facts thus brought to the attention of the court be substantiated, we have not only the primary but the paramount cause of the failure of the bank.

The responsibility of this act, if there is any liability under the law, must be classed as a common law obligation determinable alone by its principles.

Though the petition charges that the directors knew of the worthless character of the securities, it does not come within any provision of the national banking act.

The statement of these facts discloses a liability of the directors under the law.

The next act occurring about February, 1910, when it is alleged that the business of the Union National Bank became injuriously affected by an action against Courtright, Schoedinger, Hubbard and others to enforce a personal liability against them as directors in the M. & M. Bank, which suit involved the management of this bank.

The losses of the Union National between February 1, 1910, and to March 30, 1910, are alleged to be $1,000,000. The comptroller of the treasury was called in for advice and assistance following which the amount of $921,022.04 of the notes taken from the M. & M. Bank were charged off the books of the Union National, to restore which, and to make good the impairment of, capital notes aggregating $625,000 were given, by Jacobs $70,-000, Brenholts $70,000, Schoedinger $70,000, Courtright $75,000, Stewart $75,000, Boardman $72,500, Ellison $72,500, Hubbard $50,000, Cole $25,000, Livesay $15,000, Peters $30,000.

The notes of Schoedinger, Courtright, Hubbard, Livesay and Peters were given to the receiver of the M. & M. National Bank appointed about this time by the comptroller, and who settled the personal liability suit against the directors of the M. & M. Bank by a confession of a judgment for $240,000, taking the notes as above in full settlement thereof, and which was turned over to the Union National Bank by such receiver in pursuance of a contract made February 4, 1905, by which the M. & M. Bank guaranteed the notes and bills to the Union National Bank.

It is averred (p. 21) that the "notes of defendants, Courtright, Stewart, Boardman and Ellison were at the time they

were taken, and at all times thereafter, of doubtful value on account of the insolvency of said makers, and went into and are now in the hands of said receiver. That each one of said persons, then directors, owed the bank for other large sums of money for money borrowed, which are stated in the petition.

In so far as this transaction is concerned, it will depend upon whether the directors acted in good faith, prudently or not, whether they believed, and had good reason to believe that the notes were good.

At any rate it clearly appears to have been an effort to make good the inpairment of capital. No harm could come from it unless by continuing the bank longer under such circumstances some material injury and loss resulted.

In regard to the charges of the efforts of certain directors to be released from personal liability upon giving notes, an opinion is expressed that this does not go to the gist of the cause, but merely affects the question of liability and becomes an important link in the chain of acts which go to constitute the cause one in equity.

And the fact that some of the defendants have become directors at later periods and some have been directors longer than others is no ground of demurrer, because the court can discriminate between them and fix their liability according to the circumstances. *Ackerman* v. *Halsey*, 37 N. J. Eq., 356.

The necessity of adjusting this variant liability, independently of any question of accounting, is an essential fact constituting the cause one in equity.

The loans made to the D. C. Beggs Company, of which D. C. Beggs was a member and also a director, were during January, February and March, 1908, in excess of one-tenth of the capital of said bank. It is charged that the directors either knew the same to be excessive, or would have known thereof had they discharged their lawful duties.

This is not a correct allegation. It neither alleges knowledge, nor negligence. It is ordered to be made definite and certain, because it can not be determined whether it rests on the common law obligation or the statutory one under Section 5239.

Whichever it is, it is a proper matter to be taken into consideration in accounting for the losses, and it is for a court of equity to apportion any loss in capital that may have resulted therefrom. It does not amount to a separate cause of action.

From March 30, 1910, it is averred that the defendants knew of the decreasing responsibility of the debtors of the bank, or would have known it had they been diligent, etc.

Another indefinite allegation, which is ordered to be made definite.

It is then averred that from March 29, 1910, to September 1, 1911, eight reports of the condition of the bank were made, the truthfulness of which were attested by the directors named, and that each report contained the notes of Courtright, Stewart, Boardman and Ellison so given in an effort to release themselves from liability to the bank, and also the notes of the Beggs Company and other worthless notes.

It is alleged the surplus so exhibited by each of the reports did not exist; that the reports were known to be untrue reports by some of the directors, and if not so known by other directors it was because they did not give the affiairs of said bank due and diligent attention, but were grossly negligent.

This allegation will have but little bearing on the liability of directors unless it can be clearly shown that by keeping the bank going under such conditions it caused material injury and loss. The harm was done prior to this. And if the assets will pay the debts, such reports will cut but little figure. The alleged neglect concerning reports of conditions of the bank and dividends may only have material bearing on the general conduct of the directors.

Four dividends are alleged to have been wrongfully declared in 1910 and 1911, the names of the directors participating therein being stated.

This is a proper item to be taken into a consideration in an accounting of the losses, but if all the stockholders who are now stockholders were then stockholders, the amount of dividends which they so unlawfully received will be deducted from their losses.

There is but one cause of action stated in the petition which is equitable. It is equitable because the liability can not be determined without resort to the extraordinary powers of a court of equity in taking an account of the losses, not necessarily a strict account of all the accounts and books of the bank, but of so much as may be necessary to determine the losses sustained by all the stockholders who are numerous and whose interests vary in amount; and because the liabilities of the several participating directors can only be determined in equity.

A bill to recover money of a bank alleged to have been lost through misconduct of directors is not bad for multifariousness, where the matters are such as can most conveniently be tried in a single suit. *Allen* v. *Luke, supra.* (The doctrine in *Emerson* v. *Gaither,* 103 Md., 564, not followed.)

The assistance of equity is invoked, because without it the rights of the parties may not be ascertained with that fullness and certainty to which they are entitled. *Ackerman* v. *Halsey, supra; Halsey* v. *Ackerman,* 38 N. J. Eq., 509; *Brinkerhoff* v. *Bostwick,* 88 N. Y., 52; *Brinckerhoff* v. *Bostwick,* 105 N. Y., 567; *Crane* v. *Ely,* 37 N. J. Eq., 564; *Hornor* v. *Henning,* 93 U. S., 228; *Horn Silver Min. Co.* v. *Ryan,* 42 Minn., 196.

The claim is that the facts stated do not constitute a cause of action which may call in question the amount of care exacted by law of directors of national banks.

"Directors of banking corporations occupy one of the most important and responsible of all business relations to the general public. Ordinarily, the character of the directory for integrity and business capacity is the measure of the degree of confidence in the corporation by the public. The doctrine as almost universally supported by the authorities is to the effect that bank directors are not mere agents like cashiers, tellers and clerks, but that they sustain a further relation to the stockholders of trustees." *Kinkead, Torts,* Section 134, p. 278, citing numerous cases; *Delano* v. *Case,* 17 Ill. App., 531; *Delano* v. *Case,* 121 Ill., 247; *Williams* v. *McKay,* 40 N. J. Eq. (13 Stew.), 189; *Bliss* v. *Matteson,* 45 N. Y., 23, and other cases.

"The rule of liability as it is expressed by judicial precedent, perhaps without dissent, is that the directors of a banking corporation are personally liable if they suffer corporate funds

or property to be wasted or lost through acts of fraud, or by gross negligence and inattention to the duties of their, trust," etc. *Kinkead, Torts,* Section 136; *Delano* v. *Case, supra; United Society of Shakers* v. *Underwood,* 72 Ky. (9 Bush.), 609; *Ackerman* v. *Halsey, supra; Williams* v. *McKay, supra; Brinkerhoff* v. *Bostwick, supra; Sperring's Appeal,* 71 Pa. St., 11; *Miesse* v. *Loren,* 5 N. P., 307; *Horn Silver Min. Co.* v. *Ryan, supra.*

"The measure of care required of bank directors, while variously expressed, on the whole may be reduced to a rule upon which judicial precedent pretty generally unites, viz.: that degree of care which ordinarily prudent persons would ordinarily exercise. The true rule would seem to be that bank directors must use ordinary care and prudence in the trust committed to them, such care as ordinarily prudent men would use, not in their own business, but in the business intrusted to them, the proper performance of their duties to be determined in each case in view of all the circumstances (this being the invariable rule for deciding negligent acts), the character and condition of the business, and the methods usually adapted in the banking business. They must give such reasonable care and attention to the supervision and direction of those placed in charge as may be reasonably necessary under the circumstances." (*Kinkead, Torts,* Section 135, and extended note with cases quoted.)

See other cases, *Briggs* v. *Spaulding,* 141 U. S., 132; *Mason* v. *Moore,* 73 Ohio St., 275; *Shea* v. *Mabry,* 69 Tenn. (1 Lea.), 319; *Rankin* v. *Cooper,* 149 Fed. Rep., 1010; *Allen* v. *Luke,* 141 Fed. Rep., 694.

The chief neglect alleged centers on the paper taken over from the M. & M. Bank. And in respect to this it is alleged that "said defendants who were directors of said bank when said worthless or doubtful paper was so taken over, knew of its worthless and doubtful character and knew that said Union National Bank was insolvent as aforesaid, on account of the same, or if they did not have such knowledge it was because they did not give to said transaction and to the affairs of said bank due and diligent care and attention, but was derelict and negligent in the discharge of their duties as directors thereof."

The pleader evidently does not know. upon which. ground to base his claim. He evidently does not know whether to charge negligence or knowledge and intentional act. Ordinary prudence

would require directors to have the facts with reference to the taking over of the assets of the old bank explained and laid before them.   If they were, and the directors exercised their best judgment, that is one thing, if they were not that is another. Under all the circumstances of the case it is within the right and duty of the court to give effect to this alternative charge.

The court holds that sufficient facts are stated to constitute a cause of action against these defendants who may have been guilty of neglect which contributed to the losses complained of, and especially against Brenholts, Hubbard, Stewart, Schoedinger, Beggs, Meek, Davis and Cole who were directors from the organization of the bank.

The liability of the remaining directors is of doubtful character, some of them probably sustaining no liability at all.

### STATUTE OF LIMITATION.

The conclusion being that the cause of action is equitable it follows that the ten year limitation governs.

It is fundamental that the limitation applicable to equitable remedies is ten years.   We need no citation of authority on such proposition.

The demurrer of J. W. Meek in its entirety is overruled.

### MOTIONS.

Motion of D. C. Beggs overruled.

Motion by H. C. Dean.

Mr. Dean became a director January 10, 1911, remaining at the present time.   Three reports were made during his service, and two dividends.   He voted for one of them.   I can see no liability on account of the reports, because there is no injury known to have resulted therefrom.

For these reasons the motion to dismiss Mr. Dean from the case is overruled, and all other grounds of his motion are overruled.

Motion by C. S. David.

Mr. David became a director June 1, 1911.   His position is like that of Mr. Dean.   Two reports of the conditions of the

bank were made during his time, and one dividend was declared. I think the only possible liability on his part could be with reference to the dividend of October 30, 1911. On this account alone his motion is overruled.

Motion of J. H. Smith.

Mr. Smith became a director June 16, 1910. During his time, one report was made, and one dividend was declared. He is in the same position as Dean and David, and his motion is overruled for the same reasons.

Motion by L. D. Hagerty.

Judge Hagerty became a director June 30, 1910. One report was made, and one dividend was declared during his time. He sustains no liability unless it be on account of the dividend. His motion is overruled.

Motion of W. C. Orr.

Mr. Orr became a director July 30, 1908, remaining until the present time.

The original action of taking over the assets of the M. & M. Bank had been done. He was a director when the losses of the bank were alleged to be $1,000,000 and during the time when the notes were given to make good the impairment, when the Courtright and other notes were taken over from the receiver of the M. & M. Bank, when attempts to release certain ones was attempted, when the alleged false reports, and wrongful dividends were declared.

I could not now conclude with safety from the facts as they now appear whether there is in fact liability against any but the original directors.

The acts of increasing the value of the buildings, of making false reports of the condition of the bank, taking notes to make good the impairment of capital, would all tend to continue the bank; whether that was a good or bad thing the petition does not undertake to state.

The proceeding being considered equitable in character, in which the liabilities, if any, may be equitably adjusted, the court may properly retain all the parties until final hearing.

The motion of Mr. Orr is overruled.

HEARING ON DEMURRERS, MARCH 17, 1913.

RAISING PARTICULARLY THE QUESTION OF STATUTES OF LIMITATION.
DOES THE FOUR OR TEN YEAR LIMITATION APPLY?

Briefs are again submitted on a demurrer by one of the defendants on the claim that the cause of action is barred by the four year limitation under Par. 4 of General Code, 11224, making the four year limitation apply to an action, "for an injury to the rights of plaintiff not arising on contract not herein after enumerated."

In support of this contention cases are cited in which it is claimed the four or six year limitation is applied to equitable causes instead of the ten year limit, which it is claimed demonstrates that the four year limitation above applies and governs the action of plaintiff, though it be considered equitable in nature.

Counsel contend that if it be finally concluded, as the court has held on the previous demurrer by another defendant, that the ten year limitation is controlling, it will work revolution in the practice under the code, and will be in direct conflict with the whole spirit and purpose of the code. It is argued that the bar of the statute of limitations is to be based upon the act done, the duties omitted and wrongs suffered, and not upon the method or remedy chosen by the plaintiffs for the assertion of the grievances.

Attention is called to a statement in Kelly, Code Lim., that our code commissioners "applied the limitation to the substance or subject of the action, instead of to the form of the action." That is quite true. The subject of this action is the loss of the right of the stock of the stockholders in the corporation. The form of action in code procedure is by the civil action created by it; but it does not affect or change its cause of action, and statutes of limitation, while they go to the action, in substance and effect they regulate rights and causes of action.

Far be it from our purpose, as counsel contend, to "absolutely" hold that all actions in equity are regulated and limited

by the ten year limitation. We have not been unmindful of the
decisions cited by counsel where equitable relief has been sought
and had, and to which the limitations other than the ten year
one have been applied. It may be remarked, however, that some
of these cases have not been well enough considered to state the
true grounds upon which they were made to rest. As we shall
show, they have merely carried into effect or applied principles
which are axiomatic and which have been a part of the law dur-
ing the period when law and equity were separately adminis-
tered, as well as since the union of law and equity in formal pro-
cedure.

It is a familiar maxim of procedural jurisprudence that in
equity when there were no limitations applicable to causes there-
in, during the period when the doctrine of mere laches was ap-
plied, the rule was grounded or based on the analogies of the
law. That is, in cases where the subject-matter was within the
concurrent jurisdiction of law and equity, the latter applied by
analogy the limitation of law. This is illustrated by cases ground-
ed on fraud which are now, and always have been, within the con-
current jurisdiction of law and equity. In law the relief af-
forded in such cases is by way of compensation in damages, while
in equity it is by way of cancellation. In seeking relief in equity,
courts are loath to apply the remedy there sought, after the
period limited by law for relief afforded by courts of law has
expired. This phase of the question did not receive attention in
the earlier cases of *Neilson* v. *Fry,* 16 Ohio St., 557; *Loffland* v.
*Bush,* 26 Ohio St., 559, and *Carpenter* v. *Canal Co.,* 35 Ohio St.,
307, 316, although the decisions in those cases were in entire ac-
cord with the settled rules of construction, and are illustrative
of the rule of practice which has so long prevailed.

From the earliest period in the history of the law of pro-
cedure courts of equity having no statutes of limitation applied
the doctrine of laches instead, and naturally followed the like
limitation prevailing at law. Different views have been expressed
concerning the question whether equity courts applied the rule
of limitation of the law upon the principle of analogy, or wheth-
er ·it was in fact in obedience to the statutory limitation. As

long ago as *Hovender* v. *Annesley*, 2 Sch. and Lef., 607, Lord Chancellor Revesdale contended that though courts of equity were not within the words of the statute, still they were within their spirit and meaning, and therefore courts of equity acted in obedience to them, rather than by analogy to them. The same views were expressed by Chancellor Kent in *Kane* v. *Bloodgood*, 7 Johns (N. Y.), 89, which became the early rule in New York, and is considered today as among the first and leading cases in this country. See also *Murray* v. *Coster*, 20 Johns (N. Y.), 576.

The subject naturally was dealt with, first, in New York, which was the pioneer code state. And the position of the courts of that state was made clear in the decisions from the earliest periods. For example, in *Butler* v. *Johnson*, 111 N. Y., 204, the court holding that the sections of the statute of limitation fixing the time for the commencement of what had theretofore been called a legal action, is described, it must, therefore, be taken to include causes of action over which courts of equity had theretofore concurrent jurisdiction; that the Legislature must be taken to have contemplated the rule then existing, that equity followed the law in such cases, and that it was to be considered that the Legislature virtually enacted for them the same limitation.

This became the settled rule in New York. The statutes first enacted in that state were taken from the English statutes and it was considered by the courts that the Legislature and the courts adopted the rule previously existing that in all cases of concurrent and auxiliary jurisdiction, courts of equity were governed by the statute of limitations. Kelley, Code Lim., Section 48; 2 Story, Equity, Section 1520. The rule of equity was that in cases where the subject-matter was within the exclusive jurisdiction, there being no statutory limitation to serve as a guide the court merely applied the equitable doctrine of laches. Kelley, Code Lim., Sections 47, 49; 2 Story, Equity, Section 1520; *Kane* v. *Bloodgood, supra; Boone* v. *Chiles*, 35 U. S. (10 Pet.), 177.

In 1830 a statute was passed in New York (Rev. Stat. 2d Ed., 228, 229), which provided that: "whenever there was concurrent jurisdiction (not peculiar and exclusive jurisdiction)

of any cause in courts of common law and courts of equity, the limitations there prescribed therein applied to courts of equity, same as courts of law.''

Actions on account of fraud being within the concurrent jurisdiction of law and equity, of course, came under the same limitation, which accounts for the cases so strongly urged here by counsel in which relief in equity was sought, and to which the legal limitation was applied instead of the equitable one, viz., *Mason* v. *Henry*, 152 N. Y., 529; *Loffland* v. *Bush, supra.*

It became the well settled rule in New York as evidenced by the earliest cases that in all other matters of equitable jurisdiction which were within the exclusive cognizance of courts of chancery, in which there was no concurrent jurisdiction in law, the ten year limitation was to be applied. The ten year limitation statute in New York was and is precisely like ours, and was and is like ours specifically designed to apply to and govern the limitation of such exclusive equitable causes and actions. This is well settled. Kelley, Code Lim., Section 52; *White* v. *Church,* 3 Lans. (N. Y.), 447; *Linsay* v. *Hyatt,* 4 Edw. Ch. (N. Y.), 97; *Rundle* v. *Allison,* 34 N. Y., 180; *Peters* v. *Delaplaine,* 49 N. Y., 362 (specific performance); *Oakes* v. *Howell,* 27 How. Pr. (N. Y.), 145 (to reform instrument); *Montgomery* v. *Montgomery,* 3 Barb. Ch. (N. Y.), 132; *Borst* v. *Corey,* 15 N. Y., 505; *Butler* v. *Johnson, supra; In re Neilley,* 95 N. Y., 283; *Gallup* v. *Bernd,* 132 N. Y., 370; *Hoyt* v. *Tuthill,* 33 Hun. (N. Y.), 196.

The ten year statute is applied where the legal remedy is imperfect (*Rundle* v. *Allison, supra*), or where relief by action at law will result in a multiplicity of suits (*Hoyt* v. *Tuthill, supra*). It applies also to a suit for an accounting. *Gray* v. *Green,* 142 N. Y., 316.

There can be nothing more convincing than these well established rules and construction, to which may be added the further important fact that in New York there is and has been for a long time a special statute, Section 394, which provides that:

''This chapter does not affect an action against a director or stockholder of a moneyed corporation or banking association to recover a penalty or a forfeiture, or to enforce a liability

created by law, but such an action must be brought in three years.''

*Mason* v. *Henry, supra,* upon which counsel for defendants so strongly rely, was an action by a receiver which the court held not to be within the sole jurisdiction of equity but one in which courts of law and equity had concurrent jurisdiction, the question of limitation involved being whether it was an action within the statute upon liability express or implied, as the statute then stood.

Then we find the most conclusive case in that state on the questions here, in view of the statutory exception above quoted in *Brinckerhoff* v. *Bostwick,* 99 N. Y., 185, which, instead of being an action by the receiver, was an action by stockholders in their representative capacity against the directors of a banking corporation for an accounting, and for the neglect and inattention of the directors which resulted in the loss and waste of corporate funds. The court held that cause or action was not controlled by the above quoted section which excepted actions against directors of moneyed corporations, because the claim asserted by plaintiff was not ''a liability created by law,'' and was not, therefore, within the later amendment of the statutes as to such actions against moneyed corporations, ''to enforce a liability created by * * * Revised Statutes''. entitled ''Moneyed corporations'' such actions to be brought within six years after the discovery by the aggrieved party of the liability created.

The court in the Brinckerhoff case applied the ten year limitation because it held that it was ''unquestionably an equitable action,'' ''being simply the enforcement of a common law liability,'' the words ''liability created by law'' referring to a statutory liability, and not to a common law liability. We make the following quotation from the decision:

''The action was commenced by T. B., suing on his own behalf and for the benefit of the other stockholders of the bank; and, therefore, for the purpose of the statute of limitations, the action must be treated as if all the stockholders were plaintiffs. The action is really the action of all the stockholders as it was necessarily commenced in their behalf and for their benefit. It

could not have been commenced by one stockholder for himself alone.''

See *Cunningham* v. *Pell,* 5 Paige (N. Y.), 607, 613; *Cunningham* v. *Pell,* 6 Paige (N. Y.), 655 (a pioneer case).

This feature, that is, of the stockholders bringing the action in their representative capacity which renders it equitable, finds strong support in a *dictum* in *Mason* v. *Henry, supra,* which was an action brought by a receiver to compel the directors of a life insurance corporation to acconut for the assets fraudulently misapplied, which the court held to be within the concurrent jurisdiction of law and equity, and governed by the six year limitation. In discussing the character of the action after speaking of the function of a receiver in such action, the court in *Mason* v. *Henry, supra,* concludes that:                                    :

''The position of a stockholder or policy holder, in proceeding against the directors or trustees of a corporation, would be quite different with respect to the form of the remedy.       .

''He could not sue at law, but must sue in equity.

''His right of action is purely of an equitable character.

''Where directors or trustees, who are corporate agents, in the transactions of a corporate business, have committed the wrongful or illegal acts from which injury will accrue, or has accrued, to the corporate property and assets, a court of equity will entertain jurisdiction of a suit by a stockholder, or policy holder, in his own name, to obtain that relief which the corporation might have sued for itself.''

The court in that case did, however, state that even if it could be conceded that the receiver brought the action exclusively in his character as trustee of the policy holders, it would be still subject to the six year limitation.

But the acknowledgment by the court of the exceptional character of the action, if brought by the stockholders, makes the holding in that case consistent with that in *Brinckerhoff* v. *Bostwick, supra,* so that it is not an authority contrary to the ruling made in the cause at bar, but its *dictum* is in support thereof.

Counsel have cited a large number of cases in their brief, all of which have been examined, and none of which touch the ques-

tion involved by the demurrer. The difficulty with some of them is that they are governed by special statutes just as was the last New York case above referred to. This is true also of *Brown* v. *Clow*, 158 Ind., 403.

*Gores* v. *Field*, 109 Wis., 408, was under Section 4252, Wis. Stat., 1898, providing that actions against directors or stockholders of a moneyed corporation or banking corporation being to enforce a liability created by law is limited to six years, because it refers to liabilities created by statute and not to common law liabilities. This case, in fact, followed or is consistent with the ruling in *Brinckerhoff* v. *Bostwick, supra.*

The decision by Judge Mathers in *State* v. *Bank,* 7 N.P. (N.S.), 43, is another case of the same character which is founded on a statute. That is, in this case there is a statute which authorized the prosecuting attorney to bring an action for moneys lost as provided in the statute. It is, therefore, clearly a statutory liability, and not a common law liability, and, therefore, was properly governed by the six year limitation. The same is true of *National N. H. Bank* v. *Loan Co.,* 61 Minn., 373. *Stone* v. *Rottman,* 183 Mo., 552, was clearly an action at law, the court stating, however, that "doubtless in a proper case the creditors might bring a suit in equity to subject to the payment of their demand claims of the corporation against directors for nonfeasance."

If the fundamental principles had been clearly perceived, and the reasons and history of the subject set forth, we might not now have such strong protests as are made against the decision in this case as being revolutionary in character. The comments made by the learned judges in some of the cases in Ohio which are cited under this paragraph show a lack of appreciation of the intent and purpose of the code limitations. It is misleading to state that since the distinction between suits in equity and actions at law has been abrogated and the civil action substituted for them by the code of procedure, its provisions limiting the time for commencing actions apply to all civil actions, whether they be such as were theretofore of a legal or equitable nature, and must furnish the guide in determining

the bar of the actions. *Gray* v. *Kerr*, 46 Ohio St., 657; *Bryant* v. *Swetland*, 48 Ohio St.. 206; *Neilson* v. *Fry, supra.*

It is to be observed, however, that one of the learned judges who made the above comments referred to recognized the rules which have been set forth and reviewed in this opinion, in the later case of *Webster* v. *Bible Society,* 50 Ohio St., 1. The question in the latter case was the applicability of the statute 'of limitations to a trust, it being held to be the well-settled rule since the code that only cases of technical, continuing, and subsisting trusts which are within the proper, peculiar, and exclusive jurisdiction of courts of equity, are exempt from the operation of statutes of limitation. *Paschell* v. *Hinderer,* 28 Ohio St., 368; *Yearly* v. *Long,* 40 Ohio St., 27; *Douglass* v. *Corry,* 46 Ohio St., 349. Other trusts, which might be the ground of an action at law, have always been subject to such statutes. Okey, J., in *Carpenter* v. *Canal Co., supra.*

The distinction and the rule outlined in this opinion was also recognized by Johnson, J., in *Paschell* v. *Hinderer, supra,* where it was stated that:

"In all cases where there was a concurrent jurisdiction of the courts of law and equity for breaches of trusts, the rule was settled that the equitable action was barred in the same length of time as the action at law."

The learned judge refers to the case of *Kane* v. *Bloodgood, supra,* where all the authorities were ably reviewed by Chancellor Kent, the conclusion reached by him being generally accepted as the true solution of the vexed question.

Williams, J., in *Webster* v. *Bible Society, supra,* also quotes with approval the doctrine announced by Story, J., in *Pratt* v. *Northam,* Fed. Cas. No. 11376 (5 Mason), 95, that: "In cases of concurrent jurisdiction it is clear that the courts of equity are bound by the statute of limitations equally with courts of law," as well as that of Lord Redesdale in *Hovender* v. *Annesley, supra,* and of Chancellor Kent in *Kane* v. *Bloodgood, supra.*

In view of the law which has been so well settled, and as to which there can seem to be no possible question, and which has

received direct sanction and approval by the Ohio courts of last resort, the claims urged by counsel for defendants can surely have no foundation. The law as stated in this opinion is certainly conclusive that if the decision reached that the cause of action in this case is equitable and within the exclusive cognizance of a court of equity, it is governed by the ten year limitation. Of this fact we are firmly convinced for the reasons stated in this opinion.

Under General Code 11224: ''For relief on the ground of fraud'' we have the period of limitation for causes grounded on fraud either in law or in equity because in causes of actual fraud, it falls within the concurrent jurisdiction of law and equity. There may be some question whether cases of constructive fraud are not governed by the ten year clause.

Our code was copied from that of New York and its adjudications and constructions are particularly applicable. *Neilson* v. *Fry, supra,* was an action at law for contribution, a subject within the concurrent jurisdiction of law and equity.

Subrogation is also a subject within the concurrent jurisdiction of law and equity, although the cases in this state have not made this distinction and in a number of cases recently decided by the Supreme Court in dealing with the subject of trials by jury here is some *dicta* to be found in the opinions of Shauck, J., to the effect that such actions are legal and triable by a jury.

But in *Neal* v. *Nash,* 23 Ohio St., 483, which was an action by a surety to be subrogated to a judgment paid by him, it was held to be equitable. *Zuellig* v. *Hermelie,* 60 Ohio St., 27, is also a well considered case, where the primary purpose was to be subrogated to a mortgage held by the creditor, to which the ten year limitation was applied. *Coombs* v. *Watson,* 32 Ohio St., 228, was under a statute, and *Yearly* v. *Long, supra,* was an instance of the application of a limitation by analogy.

The rule to be applied to this case seems entirely clear. The cause of action of the plaintiffs, consisting in the loss of their right in stock in the corporation, under the facts of this case, must be held to be within the exclusive jurisdiction of equity, and can not, therefore, come under the bar of Par. 4,

Sec. 11224, "For an injury to the rights of the plaintiff not arising on contract." The claim made by counsel for defendants that because the acts charged are those of neglect, that they must, therefore, come within this section, ignores the fundamentals of our remedial system as well as those elements which are controlling in the determination of the nature and character of the action, which have been fully stated in the previous opinions. The reasons set forth in this opinion, and especially the matters made clear for the first time, in this case, and the authorities cited, fully demonstrate that the ten year clause of the statute of limitations covers and applies to all cases within the exclusive cognizance of courts of equity. It must be conceded that the statute of limitations is to be construed in the light, and by the aid of the rules of common law and equity which we have endeavored to set forth.

The demurrer on the ground of the statute of limitations is overruled.

I feel like remarking that in the course of my examination it was discovered that under statutes creating a right of action against directors for loss of corporate assets, it was provided by such statutes that the right of action did not accrue until discovery of the loss. An action by stockholders themselves for loss of their stock is clearly distinguishable from actions brought by a receiver for a recovery of the assets lost and wasted. It can not by any means be determined upon the face of the petition in this case that the cause now being asserted accrued at the date alleged in 1905, when the new bank took over the affairs of the old. It can not be absolutely inferred from the allegations that the plaintiff's stock was rendered valueless from that date, and that it was wholly lost. Under any view of the case, I am of the opinion that the cause did not accrue as of that date.

Considering the general demurrer by E. R. Graves, I am of the opinion that there are not sufficient facts alleged in the petition as it now stands to constitute a cause as against him. He was elected a director on May 25, 1911. There was a report made of the condition of the bank June 7 and September 11,

1911, and one dividend declared October 30, 1911. after Mr, Graves became a director.

The demurrer by the defendant Graves is, therefore, sustained for want of facts.

## HEARING ON DEMURRERS APRIL 1, 1913.

QUESTION OF LIABILITY OF DIRECTORS COMING IN AFTER ACTS OF ORIGINAL DIRECTORS WHICH WERE PROXIMATE CAUSE OF LOSS.

General demurrers are interposed to the petition for want of facts by defendants, H. C. Dean, William C. Orr, J. H. Smith, C. S. David, and L. D. Hagerty.

W. C. Orr was a director from July 30, 1908, to the close of the bank. J. H. Smith was a director from June 16, 1910, to the close of the bank. L. D. Hagerty was a director from June 30, 1910, to the close of the bank. H. C. Dean was a director from January 10, 1911, to the close of the bank. C. S. David was a director from June 1, 1911, to the close of the bank.

The acts which directly affect W. C. Orr, and, indirectly, affect the other demurrants, are those charged in the petition which relate to an action brought against the directors of the M. & M. Bank wherein it is alleged a receiver was asked about February, 1910, by reason whereof it is claimed that, "it became generally known, that said Union National Bank had taken over, when it started in business, a large amount of the assets of said Merchants & Manufacturers National Bank which was a doubtful and uncertain value, or of no value."

It is averred that by reason of that suit, and the developments therein, and of the fact that a large judgment was sought therein against Courtright, Schoedinger, Hubbard, and others, and the actual insolvency of the Union National Bank, the defendants who were directors at that time became apprehensive that they would not be able to continue the business of the Union National Bank without taking steps to end the suit, and to improve the financial condition of the Union National

Bank. The losses at that time are alleged to have been $1,000,-000 of which it is claimed the directors were apprised; that only a part of the worthless paper taken over from the M. & M. Bank was charged off, to-wit, $921,022.04, which was on March 30, 1910.

It may be remarked in passing these facts that the pleader has probably placed his own conclusion upon them.

For the purpose of causing it to appear that the losses were fully restored, it is averred that certain promissory notes were procured by the persons named and delivered to the bank as follows: F. A. Jacobs for $70,000; A. Brenholts for $70,000; George J. Schoedinger for $70,000; W. S. Courtright for $75,000; E. K. Stewart for $75,000; C. H. Boardman for $72,000; J. D. Ellison for $72,000; F. W. Hubbard for $50,000; E. A. Cole for $25,000; T. M. Livesay for $15,000; G. M. Peters for $30,000. All of the notes were made due and payable within five years, excepting that of T. M. Livesay, which was made upon demand.

The notes of Schoedinger, Courtright, Hubbard, and of Livesay and Peters were given to the receiver of the M. & M. Bank to settle the case brought against the directors for personal liability, a judgment against them for $240,000 being by them confessed, which notes were in turn transferred to the Union National Bank, in pursuance of a claim made by the latter under the contract of February 4, 1905, by which the M. & M. Bank guaranteed the notes transferred to the Union Bank. It is averred that the purpose of Jacobs, Brenholts, Schoedinger, Courtright, Stewart, Boardman, Ellison and Hubbard in the execution and acceptance of the notes (they being in control of the directory), was an attempt to release themselves from liability to the bank for the losses sustained by it through their negligence. It is also averred that in the deal concerning the notes certain common stock of the American Cash Register Company, owned by the bank but which was never carried on their books as assets, was transferred to Schoedinger, Courtright and Hubbard, and that said persons were released from liability to the bank for their negligence. A release of E. A. Cole from liability was also passed April 21, 1910, by the directors. On

March 30, 1910, the alleged raising of the valuation of the bank building is said to have taken place. It is averred that the notes so re-entered in the loans and discounts "were not sound and bankable assets" and were not in value of more than one-half and were carried at their book value until its failure; that the notes of Courtright, Stewart, Boardman and Ellison were at all times of "doubtful value"; that the directors "knew or would have known by the exercise of due care," the persons above named "owed the bank for other large sums of money." That Courtright, Boardman, Ellison and Stewart had none of them paid much, if anything, on their notes and that they are insolvent.

The above quoted allegations directly affect W. C. Orr more than any of the present demurrants, his demurrer questioning the legal sufficiency of the petition and its amendment. It may be assumed that Orr was aware of the deficiency of the assets by reason of the worthless value of the securities, and of the charging off of some of them. Assuming that the old directors were endeavoring to recoup for the losses due to their neglect, the question arises whether there was any negligence in taking the notes of the several persons who are claimed to be insolvent. The alleged neglect consists in the taking of their notes, because it is claimed they were of doubtful value, and further because each one of the parties already owed the bank large sums of money, as well as the alleged value to restore the losses that actually existed at the time the notes were taken, and which continued to exist.

The effect of the alleged releases by giving notes, namely, that of Cole, Jacobs, Brenholts, Schoedinger, Courtright, Stewart, Boardman, Ellison and Hubbard, may be considered from two standpoints. So far as it concerns Brenholts, Hubbard, Stewart, Schoedinger, Courtright, Jacobs, Boardman and Ellison, they are to be considered as directors dealing with themselves and constituting a majority of the board and in virtual control of the bank. From the standpoint of their liability to the bank, their acts in this behalf can not be considered binding, if it was not commensurate with the extent of their liability.

In such case it must be concluded that this question is now properly open to inquiry in this case.

But whether it was considered a reasonable, prudent thing to be done so as to affect other directors participating therein viz., W. C. Orr, the present demurrants,—so as to affect their liability is a different question.

It is not an imprudent thing to make good the impairment of capital of the bank. If directors liable for losses were willing to make reasonable adjustment of their liability to the bank or losses chargeable to them, it was proper and commendable for them to do it; so was it proper for the disinterested directors to acquiesce in it provided what was done was fair and reasonable under all the circumstances. The question, then, is one of reasonableness of the settlement,—if one was made. Was the amount reasonable and were the notes reasonably good, and the best that could be obtained under all of the circumstances? The notes described and set forth in the petition alleged to have been worthless, aggregate the sum of $1,000,870.30, although the petitioners aver that they are unable to determine from the books of the bank whether any of such notes were secured by collateral or otherwise secured, or afterwards reduced by partial payments, except the notes of Park and Morris, Morris, Sinks and Knox, aggregating $117,510. Deducting this from the $1,000,870.30, it leaves $883,360.30 of impaired paper according to the theory of the petition. The aggregate of the notes given by the directors is $625,000, $240,000 of which were given to settle the action against certain of the directors of the M. & M. Bank. According to the figures of the petition, this would leave an apparent discrepancy or deficiency of $258,360.30 of impaired assets not made good,—although the petition is uncertain in its averments whether the alleged worthless paper was further reduced by payments, or was secured by other collateral, so that the allegations of the petition itself leaves the question of deficiency, or loss, in doubt and uncertainty. Under such allegations and under all of the other circumstances appearing in the case, the court is warranted in presuming that the notes given by the several directors probably made good the apparent

impairment of capital, and satisfied the bank examiner and comptroller of the currency. It is reasonable to suppose that the officers of the federal government who have almost unlimited discretion in the control of the bank were reasonably satisfied at the time that the impairment of the capital had been reasonably restored.

It is averred that Courtright, Stewart, Boardman and Ellison whose notes aggregated $292,000 had not paid any part of their notes and that the same were of doubtful value at the time when taken. It is claimed that the real estate which cost $300,000 was increased on the books to the amount of $150,000, which amount was passed to the bond, stock and securities account. It might have been true that the real estate had reasonably increased to that amount, although it may have been irregular to have put it in the stock and securities account.

Whether there was any negligence chargeable to W. C. Orr by reason of his alleged participation in these acts, particularly in accepting the notes of Courtright, Stewart and Boardman, is the principal question affecting his liability as a director. Looking at this matter from the sole standpoint of Mr. Orr as a director, it is not unreasonable to assume that he acted in good faith, looking to the condition of the bank, and considering the notes that were offered, that he believed that it was the proper and ordinarily prudent thing to be done under all of the circumstances. The allegations of the petition in the light of all the development then and now containing the averment that the notes were of "doubtful value" may reasonably warrant the conclusion now under all the circumstances that Mr. Orr was prompted by a reasonable and ordinary belief that the notes were good. It could almost be said that even though these notes of the directors had been entirely worthless, that no harm actually resulted to the stockholders by their acceptance under all the circumstances of the case. Furthermore, Mr. Orr was in the minority in the directorate, and any protest that he might have wished to have made would have been unavailable as against the action of the majority of directors who were personally interested in relieving themselves from liability to the bank

for losses. Looking even at the allegations of the petition and their indefinite character, there is not such an apparent or glaring discrepancy between the alleged losses and the face of the notes taken as justify the inference of gross neglect on the part of the directors in this note transaction. Furthermore, Orr could have done nothing but to protest, if there was occasion for it; and protest by him would not have been available if the interested majority directors persisted in doing what they apparently did.

Much stress is laid in the amendment to the petition that some of the directors,—other than those who afterwards became financially irresponsible,—were, during the continuance of the bank as a going concern, financially able to have made good, by due process, of law, the losses of the bank, but that the directors, neither collectively nor individually, took any steps or made any effort to have the losses restored, although the same were "readily discoverable and apparent from any proper and reasonable examination of the bank"; that the "directors never made or caused to be made any such examination," but "remained negligent and inactive in respect thereto and so permitted said losses to be carried unrestored, until they caused the failure of the bank."

As we view the claim the burden of it is that because some of these notes were of "doubtful value" and afterwards when the bank failed, they proved to be worthless, Orr, as well as the other demurrants, were negligent in not discovering the worthlessness of the assets which would be made apparent by an examination of the books.

It may be presumed that the pendency of the suits involving the personal liability of directors of the old bank on account of their acts in merging it into the new bank constituted some notice to the then directors of the difficulties concerning the assets taken over. In fact is seems rational to assume that all the subsequent directors were aware of the merger of the old bank into the new. But what effect would even that knowledge have upon the directors in respect to their duties? This *quaere* is directed more especially to the demurrants other than Orr.

What was Mr. Orr's duty during the occurrence of the particular matters with which he was concerned? What were the duties of the other demurrants who came in much later than Mr. Orr? Was it the duty of the later directors to make special examination of the books, or to go to the clerks and officers of the bank for information and seek personal information about these matters?

We know that it is not the way that ordinarily prudent bank directors do; we know that they act upon the information and reports brought to them by their officers and employes who are paid for that purpose. We know that they must necessarily commit the business of the bank to the officers. We know, too, that this does not absolve them from the duty of a reasonable supervision. Indeed, the sum total of the duty of bank directors who serve without compensation, is to exercise such reasonable and ordinary supervision over the affairs of the bank as their duties reasonably and ordinarily demand or suggest. They are in no sense to be held as insurers of the fidelity of the officers, but they may, on the contrary, place the usual and ordinary reliance upon officers who bear good reputations for honesty and efficiency.

There is probably no dissent from the rule that directors are personally liable if they suffer corporate funds to be wasted or lost through fraud or by gross negligence and inattention to their trust. They are to use such care as ordinarily prudent bank directors ordinarily use in the banking business. Directors act as a body by their vote; or individual members of the directorate act as specially appointed committees, making reports of the matters committed to their care to the whole board. The board probably acts ordinarily only upon that which is brought before them either by their officers or committees or what they, themselves, may order to be brought before them. If anything occurs which ordinary prudence requires that special examination of the books or the securities of the bank be made, of course that should be required to be done.

Therefore it is apparent that more facts will have to be stated than are now stated to constitute a cause of action against these defendants.

We can do no better than to call attention to certain excerpts from the admittedly leading case of *Briggs* v. *Spaulding,* 141 U. S., 132, 133 (11 Sup. Ct. Rep., 924; 35 L. Ed., 662), which we put here in a partly modified form in our own language.

The degree of care required (in any kind of a case) depends upon the subject, and each case has to be determined by its own circumstances. There are certain things which in their management require the utmost diligence, and most scrupulous attention, and where the agent who undertakes their direction renders himself responsible for the slightest neglect. There are others where the duties imposed are presumed to call for nothing more than ordinary care and attention, and where the exercise of that degree of care suffices, the directors of banks from the nature of their undertaking fall within the class mentioned, while in the discharge of their ordinary duties. Other officers who serve for compensation have immediate management. Directors can not guard it by constant superintendence. The director's duties being those of control,—any neglect which will render them liable must depend upon the circumstances. If nothing has come to their knowldge to awaken suspicion of the fidelity of the president and cashier, ordinary attention to the affairs is sufficient. If they become acquainted with any fact calculated to put prudent men on their guard, a degree of care commensurate with the evil to be avoided is required.

It must be made to appear that the losses for which defendants are required to respond were the natural and necessary consequence of omission on their part. (p. 151.)

In any view the degree of care to which these defendants were bound is that which ordinarily prudent and diligent men would exercise under similar circumstances, and in determining that the restrictions of the statute and the usages of business should be taken into account. (p. 152.)

Johnson, one of the directors, was a depositor, was in the bank from time to time, and was informed that the bank was prosperous and that everything was going well. He signed the report marked 1182, sworn to by the cashier. He was informed that the report contained a correct exhibit of the condition of

the bank, as shown by the books. It was testified to that it would have taken a month to ascertain whether the reports to the comptroller were correct; and that it was the duty of the comptroller and the bank examiner to do so. (p. 158.)

Even trustees are not liable for the wrongful acts of cotrustees, unless they connive at them or are guilty of negligence conducive to their commission. (p. 159.)

Knowledge of books and papers is not to be imputed to directors (p. 162) as Judge Earl said: "He was simply a director, and as such attended some of the meetings of the board of directors. As a director must we impute to him * * * a knowledge of all the affairs of the company? If the law requires this, then the position of a director in any large corporation, like a railroad, or banking, or insurance company, is one of constant peril. The affairs of such a company are generally, of necessity, largely entrusted to managing officers. The directors can not know, and have not the ability or knowledge requisite to learn, by their own efforts, the true condition of the affairs of the company. They select agents in whom they have confidence, and largely trust to them. They publish their statements and reports, relying upon the figures and facts furnished by such agents; and if the directors, when actually cognizant of no fraud, are to be made liable in an action * * * for any error or misstatement in such statement and reports, then we have a rule by which every director is made liable for any fraud that may be committed upon the company * * * in the diminution of its capital by any of its agents, and he becomes substantially an insurer of their fidelity. It has not been generally understood that such responsibility rested upon the directors of a corporation, and I know of no principle of law or rule of public policy which requires that it should." *Wake* v. *Dalley*, 51 N. Y., 27.

"We are of opinion that these defendants should not be subjected to liability upon the ground of want of ordinary care, because they did not compel the board of directors to make such an examination and did not themselves individually conduct an examination during the short period of service, or be-

cause they did not happen to go among the clerks and look through or call for and run over the bills receivable.'' (pp. 163, 164.)

How shall these rules be applied here,—each case depending upon its own circumstances? As to Mr. Orr, even with knowledge on his part of the difficulties which confronted the bank, it can not be said that he owed an individual duty to examine the books. It must be taken for granted that he, together with his associates who were interested differently from him, were well advised in regard to the distress of the bank, so far as concerned its impairment of capital, for they had charged off assets, and attempted to make good the impairment. Mr. Orr, of course, according to the ordinary rule of prudence, presumably,—in the absence of negative averment,—learned the situation from the officers; and if he did he had the right to rely upon it, unless something occurred to cause him to distrust them, or which aroused his suspicion, and there is no allegation or circumstance here to the contrary. In fact, the only charge made against him in this behalf is that he did not do what he could to collect the notes of ''doubtful values'' taken to make good the impairment of capital, or rather that he, with other directors failed to take steps to restore the losses.

It should be assumed, of course, that Mr. Orr as a director was bound to take notice of the self-interest of the directors who gave their notes, and still whatever may have been his attitude in this matter, and the care exercised by him in regard thereto as an individual, it had little or no effect on what was actually done, because the directors who were interested in clearing themselves from liability were as alleged in the petition in virtual control of the board, and had evidently made up their minds to endeavor to save the bank by putting up the securities represented by their respective notes, and which did have the· effect of prolonging the life of the bank, without apparent injury to the stockholders, because it is averred that there are now sufficient assets to pay the debts, and we can not speculate on what the bank might have made for the stockholders, if they had continued in business.

Furthermore, as to Mr. Orr, it may be said that as a director, he had the right to rely upon the report of the condition of the bank made by the officers, if they were of good repute, and he had no reason to suspect their dishonesty. And the petition makes no such claim. The fact that he knew that some of them were supposed to be liable for the losses of the bank is not sufficient warrant to charge him with bad faith in an act of accepting notes to make them good, if he honestly believed that that was the best thing to be done, and if ordinary care and prudence suggested this as the reasonably best thing that could be done. And there is nothing here to show that he failed to observe due and ordinary care in that matter. Plaintiffs, in their allegations in the petition are not even definite or sanguine about this, because their allegations in respect to some of the paper show lack of knowledge in respect thereto, and then the claim made even now under the light of subsequent circumstances is that the paper of the directors who afterwards became insolvent, was merely of doubtful character. Then how must it appear to Mr. Orr at the time when he probably relied upon the officers for the conditions of the bank and when in the absence of anything to the contrary he may have reasonably believed that the taking of these notes was the best thing to be done under all the circumstances? In the absence of anything to the contrary the conclusion of the court as to the conduct of Mr. Orr is that but for aught that is contained in the petition, he acted as an ordinarily prudent person under all the circumstances.

To make entirely clear the mind of the court, let it be understood that the conduct of the "interested" directors may not be considered in the same light. The conduct of all those who were directors from the beginning is an open question, and their action in giving and receiving these notes is not conclusive, but is the remaining subject of inquiry in this action. Furthermore, there are necessarily certain predominant facts in this case about which there can be no dispute. A chancellor will eventually have to determine from the paramount facts in the light of the incidental facts and circumstances where the

responsibility is.   A court of equity must determine and adjust the liabilities, if any, according to the part taken, the duty owing, and the proportionate effect of individual acts of directors, if any, in causing and contributing to the injury.   Upon the present demurrers the court is called upon to consider the facts alleged from an entirely different viewpoint from that at any other time in the consideration of the case.   In considering the demurrer of J. W. Meek, the predominant thought was concerning the acts in the matter of merging the affairs of the two banks.   In passing upon his demurrer it was not essential to consider the questions that are now raised by the present demurrer.   At that time the one conspicuous idea was the charge that the new bank in taking over the assets of the old and assuming its liabilities, started out as an insolvent institution. Now, we have clearly presented not only the questions of duty and omission of the subsequent directors, but as well the pertinent question whether the acts of taking notes of certain directors for the losses, the reports of the condition of the bank made by officers and certain directors to the comptroller of the currency, and the declaration of dividends, contributed in part to any material extent or degree in causing the loss to the stockholders.

The directors who came in after the merger of the old bank which is believed to have been the chief thing done which constituted the primary and efficient cause of the injury to the stockholders can not be held liable therefor, unless it can be shown that their subsequent acts in some way materially contributed to the loss.   It is, of course, fundamental that negligence without injury is not actionable.   Smith, Hagerty, Dean and David came in after June 1, 1910.   Brenholts, Schoedinger, Beggs, Davis and Cole had gone out.   Thereafter eight original directors remained for a time, and eight who were not in from the beginning came in, Bowland and Orr having come in prior to June, 1910, continuing until the end.   The present demurrants, other than Orr, having come in after June 1, 1910, their acts are to be measured on the same basis as to all matters occurring prior to that date.   They can, of course, be charged with

nothing which occurred prior to that time.   The only complaint
made against them is that they failed to restore the losses re-
maining after the transactions of March and April, 1910, con-
cerning the giving of notes. · It is averred as to them also that
the losses were readily discoverable and apparent from any
proper and reasonable examination of the affairs of the bank,
but that the directors remained negligent and inactive and per-
mitted the losses to be carried unrestored.   These persons con-
tinued directors until the close of the bank.   Smith and Hagerty
served about eighteen months, while Dean served eleven months,
and David about six months.   Their duties did not call upon
them to make an examination of the books, but they were re-
quired merely to use ordinary care in the performance of their
duties as directors in obtaining such information as to the con-
dition of the bank as would enable them to intelligently perform
their duties in a reasonable supervision of the affairs of the
bank.   They were justified in acting upon the reports of the
officers of the bank, of its loan committees, and particularly upon
the acts of the bank examiners and of the comptroller of the
currency.

The mind of the court is that sufficient facts are not al-
leged against these four directors concerning the matter of
losses to constitute a cause against them.   They can not in any
manner be charged with the original cause of the loss of the
stockholders, but they are in fact only charged with failure to
discover them.   Up until the last few months of the life of the
bank, the old officers and directors remained in office and prob-
ably in control.   In the absence of a more substantial and rea-
sonable showing, it is pure conjecture as to what these four di-
rectors could have done by the exercise of ordinary prudence
in the matter of the restoration of losses, even if they were
actually aware of them, if any there were.

But the predominant fact is, according to the general theory
of the complaint, that the prime cause of the loss claimed is
the taking over of the assets of the old bank and the assump-
tion of its debts.   Negligence is the gist of the complaint of the
liability asserted, and the ordinary rules of law must be applied.

According to the allegations of the petition, the complete loss
as before stated must have been made effectual at the begining
or in the early history of the bank. The acts of the directors
that came in after the loss had actually occurred can not be
mulcted in damages if they did not in any wise materially add
to or increase the loss complained of. That they did not ma-
terially add to the loss is clear in view of all the allegations of
the petition. With reference to the claim made that some of
these men were during the continuance of the bank as a going
concern financially able to make full restoration of the losses
that remained after the transaction of March, 1910, it may be
observed that bank directors are but ordinary persons and can
not accomplish the impossible, but can only do that which ordi-
nary men may accomplish. At least eight of the old directors
remained as such for some months after March 30, 1910, and
had, as before stated, practical control. The very persons who,
according to the petition, had settled with themselves ap-
parently remained in virtual control so that the new directors
were helpless even if they had become advised or could have
become advised of the losses by the exercise of ordinary
prudence. The only way in which any such alleged losses could
have been recovered would have been by action at law, but in
the face of the allegations the fact remains that it must be pre-
sumed that these newer directors were justified in acting upon
the attitude of the bank examiners and comptroller of the
currency. A minority of directors could not have forced either
a settlement or a law suit, and if they had undertaken by the
ordinary legal processes to have restored the alleged losses, the
inevitable result would have been failure of the bank. The
claim is made in one place in the petition that if efforts had
been made to restore the losses, the bank could have been con-
tinued as a going concern, while in another part of the petition
it is urged that when the bank was insolvent it ought to have
been wound up and dissolved.

We are bound to conclude that the original acts of the
original directors must be considered the proximate cause of the
injury complained of, and that whatever negligence may be

claimed against the present demurrants is so slight, as not to constitute actionable negligence against bank directors, and is so remote as a producing cause as not to be actionable in any event.    This will also apply to the subsequent acts concerning the reports to the comptroller of currency and the declaration of dividends.

Now, taking up the matter of complaint concerning the reports to the comptroller of the currency it is to be observed that these reports are made up by the officers and certified by three of the directors.    It is not a matter which is brought to the attention of the whole board, so that any alleged neglect in making the same can not be charged against all of them, except as they might become aware of the general result by the ordinary means from published reports, and by inquiry.    The officers swear to the reports while the directors merely certify to them, and for this purpose they are not required or expected to examine the books.    The petition shows that Orr certified the report of March 29, and September 1, 1910, and of June 7, 1911. Hagerty certified to the one of November 10, 1910; Smith to that of March 11, 1911; Dean to the one of June 7, 1911, and David to the one of September 1, 1911.    Each one of the reports certified to an unimpaired capital and the existence of a surplus fund.    It is averred that the total loans and discounts shown by each one of the reports contained the notes of Courtright, Stewart, Ellison and Boardman, and other notes given by the same persons for money borrowed, and the notes of Beggs & Company assumed by Hamilton, and the notes of C. E. Miles, and bonds of the Ralston Steel Car Company, all of which amounted to a considerable sum of money and that they were considered as the basis of making up the report.    It is averred that the reports were known to be untrue by Courtright, Jacobs, Ellison, Stewart, Meek, Orr, Vaughan, and Boardman and by the comptroller of the currency, and that if not known to be untrue reports by Hagerty, Smith, Dean, Graves and David, it was because they did not give to the affairs of said bank due and diligent attention but they were grossly negligent in respect thereto.

This ground of complaint being with reference to a duty prescribed by the National Banking act, charges must be made to conform to the exclusive rule of liability therein prescribed. The rule is that there is no liability, unless the directors knowingly violate the provisions of the banking act, or unless they knowingly permit others to violate the same. This matter has. been fully covered in the first opinion. See U. S. Rev. Stat. 5339; *Yates* v. *Bank,* 206 U. S.. 158 (27 Sup. Ct. Rep., 638; 51 L. Ed., 1002).

The averment on its face as against Mr. Orr conforms to the rule above stated, but the same is not true as against Hagerty, Smith, Dean and David, because it is made to rest upon a charge of gross negligence. It is held not good as to them not only because it does not conform to the rule of law above stated but for other reasons hereinafter set forth.

Considering the charges concerning the reports further as to Mr. Orr, it is to be observed that the theory of the complaint is that by circulating printed· copies of abstracts of the reports showing the unimpaired capital and the existence of a surplus, it was made to appear to the stockholders that the bank was solvent, whereas it was at all times insolvent "and by such means kept said bank open and doing ·business when by law it should have been closed up and liquidated," and that during the period covered by the report the losses to said bank continued to increase by the growing insolvency of the debtors thereof. as each and all of the said defendants either knew or would have known had they given to the affairs of said bank reasonable attention.

It does not appear that the keeping of the bank open which the reports resulted in doing, materially contributed to the injury to the stockholders, because their rights in the opinion of the court were entirely destroyed by the alleged acts in connection with the merger of the two banks, according to the theory of the petition. The keeping of the bank open did not cause such injury that there was such diminution of the assets that the bank is unable to pay its debts, the allegations being that there are sufficient to do that. The theory of the charge

is that by keeping the bank open from March 20, 1910, a period of twenty-one months, the ability to recover from Courtright, Boardman, Ellison and Stewart was lessened. The allegations in this respect are indefinite, leaving the matter open to conjecture and speculation. The notes had been given for a period of five years, and nothing could have been done in the way of collecting the notes until their maturity. Nothing could have been done therefore by way of collecting any losses from the directors; except by an original action, ignoring the notes. With the management of the bank virtually under the control of the persons whose conduct is alleged to have been the cause of its ruin, there was little that an individual director or a minority could do in the way of bringing an action. Furthermore, for the twenty-one months covered by these reports, it is to be presumed that the bank examiners examined the affairs of the bank from time to time and made reports to the comptroller of the currency. Otherwise, the bank would not have survived as long as it did. In view of the law and the requirements of the National Banking act and of the duties imposed by it upon the comptroller of currency and his assistants it is entirely rational to presume that if the affairs of the bank were in such deplorable condition as the petition now makes them to be, the comptroller of the currency would have closed its doors.

It is true that plaintiffs have averred that the comptroller of the currency aided and abetted in the acts of misfeasance complained of, but from the allegations in the petition it can not be assumed that that officer deliberately acquiesced in clearly negligent acts, or that he aided and abetted in specific direct violations of the spirit or letter of the banking act. In the first opinion rendered in this case, looking to the question from the right of the plaintiffs to maintain this action, some comment was made by the court concerning the allegations with reference to the comptroller of the currency. Little weight, if any, were given them in deciding the right of the plaintiff to sue. Certainly, they were not considered seriously as the court has been compelled to do at this time. It must be observed that the comptroller of the currency is placed in absolute charge of the

affairs of the national bank in so far as they may violate any of the provisions of the national law. The power and discretion of the comptroller is broad and comprehensive, it being within the appropriate scope of his duty to advise with and aid banking officials to tide over difficulties which they may encounter.

The comptroller, no doubt, did advise and consent to some of the acts done by the directors with reference to some of the matters touched upon by the plaintiffs, but it is to be presumed that they were believed to have been the best thing to be done to save the bank from ruin. It is to be presumed that that officer and his representatives believed that the giving and receiving of the notes by the directors to make good the impairment of the capital was proper, and that the notes were reasonably good or else the bank would have then liquidated. And it must have been considered by that department that these notes remained good during the period covered by the reports, and that the belief was not changed until the time of closing the bank.

A court of equity in disposing of this case, either finally or now on demurrer, is bound to apply equitable principles in adjusting the liabilities of the different directors. And in the exercise of its judgment, it must consider the measure of prudence to be applied, whether proper care was probably applied, and what the probable effect of particular acts was. While plaintiffs allege that Orr knew the reports to be untrue, the natural presumption from the facts and conditions appearing from the pleadings belie the allegation. He knew these notes were part of the assets of the bank; and he, as well as the bank examiners, and other directors, probably did not know that Courtright, Boardman, Stewart, and Ellison, who had, in the absence of allegations to the contrary, as the court may assume, been hitherto of good repute financially, and were not financially bankrupt until about the time the crash came. Applying the rule of ordinary prudence to the charge that by reason of the false reports, the bank was kept open which lessened the chances of recovery from these men, we must apply the rules of common sense and ordinary experience in such matters. We are bound

to know how difficult it is to learn of the financial ability of persons until there appears some clear manifestation. If it was so apparent for such a length or period of time as claimed by the plaintiff that these men were in such financial condition and not fit persons to be officers and directors of the bank, why, it may be inquired, should the stockholders have continued to elect them during that period, if it was a matter of common knowledge?

We must not expect or exact impossible or improbable things. It is easy, after the crash, to say that these men knew these things, but the rule is, like the man who killed another in self-defense, how did it appear to him under the conditions and circumstances at the time?

As a matter of equity, looking to the part taken by Mr. Orr, in reference to the notes and reports, it is not possible to arrive at any tangible basis for holding him responsible for the losses in view of the fact that they must have occurred earlier than his service according to the allegations of the petition, and because any acts committed by him were not a material producing cause in contribution thereto.

The claims made seem rather remarkable.

Here was a bank which took over assets and assumed debts, with $750,000 fresh capital, all paid in, and still is started out as an insolvent. It took over so much worthless assets that it was totally insolvent from the time it began until March 30, 1910, at which time the losses are said to be more than a million. It had gone for a period of five years with so many worthless assets that it was insolvent, the losses totalling a million, and still it passed muster with the comptroller of the currency who had evidently not discovered its insolvency, else it could have been closed. But the comptroller comes in on the transaction of repairing the losses in March, 1910, he being called in to assist in fixing up the affairs of the bank. At that time "in order to keep said bank open, which was the purpose of said defendants, and said comptroller, and because said defendants and said comptroller could not furnish nor devise means to fully restore said bank's financial condition, and to make what was to be

done, and was done, seem more reasonable and plausible,'' etc. Then for twenty-one months after this, the bank still passed muster with the government until it was closed, and it now has enough assets to pay its debts. All this tends to demonstrate one thing, viz: the varying character of opinion of concerning the value of credit. In the face of the claims of insolvency, of worthless assets, of misconduct of the comptroller of currency, etc., the total loss today is the amount of stock, $750,-000, if the allegations of the petition are to be relied upon, unless we are to speculate on what might have been made for the stockholders, which can not be done, and during all the life of the bank the stockholders received dividends upon their stock.

These last statements are made because it reflects upon the use of ordinary prudence and judgment of bank directors in passing upon the value of paper.

This is the one problem in this case. What were the assets of the old bank reasonably worth at the time they were taken over?

If the directors used ordinary care in passing judgment on the paper, then there is nothing in this case.

If they failed to observe ordinary care at that time, that then is the proximate cause of the loss to the stockholders.

As already stated, it was entirely proper, under the law, for the comptroller of the currency to give advice and succor to the bank in order to enable it to pull through their difficulties, if possible, and the facts generally stated in the petition fail to support the aspersions cast by the pleadings upon his motive. It was done for either of two purposes, viz., either to secure the right or the support of the right of the stockholders to bring this action or to get away from the presumptions which, of necessity, must arise from the examination of the bank made by the officers under the comptroller and upon which the directors, other than the president and cashier of the bank, had the right to rely. It may be observed that this matter was given little weight in the original opinion touching the question of the right of plaintiffs to maintain this action, their right being grounded upon stronger reasons. Directors of banks can not begin to

learn and know as much as bank examiners and its officers, and managers know of its affairs. They have the right to rely upon both until something occurs to arouse suspicion. Bank directors, of course, are not figureheads, and reasonable prudence requires them to call for information continuously about the credit of the bank. But the loan committee are to be relied upon in the first instance. It is not disclosed, however, how the matter of passing upon the value of assets of the old bank was done, and the presumption, therefore, must be that each and all of the directors assumed the responsibility in the beginning.

Some remarks of the court in the case of *Easton* v. *Iowa, supra,* materially reflect upon the matter of insolvency of a bank, and the duty and discretion of the comptroller of the currency. A statute has been passed, making it the duty of the officers of the bank when they know it is insolvent to at once suspend its active operations, making it a criminal act for failure so to do. The court held such act unconstitutional, and at one place stated the following:

"Whether a bank is or is not actually insolvent may be, often, a question hard to answer. There may be good reasons to believe, that, though temporarily embarrassed, the bank's affairs may take a fortunate turn. Some of the assets that can not at once be converted into money may be of a character to justify the expectation that, if actual and open insolvency be avoided, they may be ultimately collectible, and thus the ruin of the bank and its creditors be prevented. *McDonald* v. *Bank,* 174 U. S., 610 (19 Sup. Ct. Rep., 787; 43 L. Ed., 1106). But, under the state statute, no such conservative action can be followed by the officers of the bank except at the risk of penalties of fine and imprisonment. In such a case the provisions of the federal statute would permit the comptroller to withhold closing the bank, and to give an opportunity to escape final insolvency. It would seem that such an exercise of discretion on the part of the comptroller would, in many cases, be better for all concerned than the unyielding course of action prescribed by the state law. However, it is not our province to vindicate the policy of the federal statute, but to declare that it can not be overridden by the policy of the state."

In respect to the ·dividends which are alleged to have been declared without sufficient examination or without ordering any examination, it is the opinion of the court that they did not materially contribute to the injury complained of, and that none of the present demurrants are in any wise affected thereby.

With reference to the averment that one dividend was declared upon advice with the comptroller of the currency, it is to be presumed that that officer acted in good faith and upon reasonable ground in the absence of a clear showing to the contrary. The stockholders received the dividend, and the only complaint that can be made is that a wrongful declaration of dividends tended to prolong the life of the bank. No greater injury could have been caused by these acts than by the reports of the comptroller.

The averment as to the abstraction of certain pages of the general journal whereon the transactions of March 30, 1910, should be regularly entered, is that this was done for the purpose of preventing the stockholders from knowing or learning the facts concerning them; that it was done to conceal the sources and methods from any by which said bank's financial affairs had been tampered with and to conceal the true financial condition of the bank  It is said that the comptroller of the currency advised the abstraction. If he did, it is to be presumed that he had reasonable ground for advising some action concerning it. The effect of such allegations is rather to reflect on the motive supposed by the pleader to have prompted the directors in the charging off of assets and in the taking of the notes of the directors. The matters are said to relate to the attempt by the eight directors to release themselves. If it was in relation to an alleged release of the directors, the comptroller would be justified in giving such advice. At any rate the matters concerning the alleged abstraction of the pages of the journal being evidential of motive, rather than of operative fact, for a pleading, do not add to the general facts which go to the matter of charging off of assets, and the giving of notes to repair the same. These transactions have been considered in their effect upon the liability of the present demurrants, and we

do not see how the last mentioned matter changes the situation, and the letter written by the comptroller to the board of directors in which it was stated that the capital of the bank and its surplus was unimpaired, which was spread upon the minutes, is alleged to have been for the purpose of maintaining the confidence of the stockholders and the customers of the bank. It is charged that this letter was written, "pursuant to influence unknown to plaintiffs." It was no doubt written to inspire confidence and it should rather be assumed that the comptroller did it upon facts submitted, believing it to have been reasonably justified. But in all events we come back to the proposition that in whatsoever light these matters are to be considered, it does not appear that the prolonged continuance of the bank in operation, materially added or contributed to the primary and paramount cause of the loss.

The conclusion is that the proximate and efficient cause of injury to the stockholders were the acts of taking over the assets of the old bank, and the assumption of its debts, the decision now being that each and all of the present demurrers are sustained, and the several defendants are discharged from the case.

The pleadings of plaintiffs should be amended.

If there is a desire to present an amended petition affecting further the presents demurrants, it would only be considered on leave, upon a proposed pleading presented for consideration. If there be no such desire, the pleading is ordered amended to conform to this decision by omitting these defendants, and by the omission of all reference to the matters covered herein as to any defendants for the reasons stated in this opinion.

The entry may be prepared accordingly, saving exceptions, to which error may be prosecuted, if desired, before final hearing, as to the other defendants. Any amendments may be submitted to the court on April 14 as to the present demurrers on motion for leave to file. The other amendment as to the old directors should be filed April 5 and answered by the defendants by April 12. Any proposed amendment as against the present demurrants may be put in the form of an amendment to the original petition.